**MISSOURI PROPERTY AND CASUAL-TY INSURANCE GUARANTY ASSO-CIATION, Plaintiff/Appellant,**

v.

**PETROLITE CORPORATION, Defendant/Respondent.**

No. 68061.

Missouri Court of Appeals,
Eastern District,
Division Three.

Feb. 6, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 11, 1996.

Application to Transfer Denied
April 23, 1996.

Kevin P. Schnurbusch, St. Louis, for appellant.

Joseph H. Mueller, Robyn G. Fox, St. Louis, for respondent.

RHODES RUSSELL, Judge.

Missouri Property and Casualty Insurance Guaranty Association ("MIGA") appeals the granting of summary judgment in favor of Petrolite Corporation ("Petrolite") in an insurance indemnity dispute. We affirm.

Petrolite was insured under a commercial catastrophe policy issued by Integrity Insurance Company ("Integrity"). The policy provided coverage of $5,000,000 per occurrence, $5,000,000 annual aggregate, with a retained limit of $10,000.

On October 7, 1985, William M. Zachary, ("Zachary") a former employee of Petrolite, filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") claiming that he was discharged by Petrolite because of his race. The EEOC filed a Complaint on September 23, 1988, against Petrolite in the United States District Court of California alleging that Petrolite had engaged in unlawful employment practices in violation of § 703(a)(1) of Title VII, 42 U.S.C. § 2000e–2(a) (1988).

At all times relevant to the EEOC action, Petrolite was insured by the Integrity policy. Integrity, however, had been declared insolvent by a Superior Court of New Jersey on March 24, 1987. As a result of that insolvency, Petrolite demanded that MIGA provide it with a defense to the charge and indemnify it for any loss.[1]

MIGA did defend Petrolite in the EEOC action. With Petrolite's knowledge, MIGA settled the action by making a payment of $11,000 to Zachary. MIGA then requested that Petrolite pay MIGA $10,000, the amount of the retained limit under the Integrity policy. Petrolite refused to pay that amount.

On May 9, 1986, Richard Godar ("Godar"), another former employee of Petrolite, filed a Complaint against Petrolite in the United States District Court for the Eastern District of Missouri, alleging that Petrolite discharged him on August 12, 1985, because of his age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1) (1988). At the time of the discharge Petrolite was likewise insured under the Integrity policy. After Integrity's insolvency, Petrolite again requested that MIGA provide it with a defense and indemnify it for any loss incurred. MIGA defended Petrolite before the district court. After a jury trial, a verdict in favor of Godar in the amount of $193,000 was returned on July 1, 1988. The court however entered a judgment in favor of Godar in the amount of $386,000, double the actual damages, based upon the jury's finding that Petrolite had acted willfully. The court thereafter awarded Godar $29,973.50 in attorney's fees and ordered Petrolite to reinstate Godar. An additional $51,098.37 was awarded to Godar on May 31, 1991, as front

---

1. MIGA was created by § 375.785 RSMo 1986 (now repealed). MIGA was established to provide benefits to holders of insurance policies issued by companies who have become insolvent and are unable to pay valid claims. *Pritchett v. Clifton,* 738 F.2d 319, 320 (8th Cir.1984).

pay, in lieu of compensation lost by Godar between the date of the jury verdict and the date of his reinstatement.

After the court's judgment, MIGA withdrew its defense of Petrolite and declined to indemnify Petrolite for any part of the judgment. Petrolite continued the litigation and appealed the case to the 8th Circuit Court of Appeals, where the judgment was affirmed.[2] *Godar v. Petrolite Corp.*, 982 F.2d 525 (8th Cir.1992).

The present action began on May 11, 1994, when MIGA filed a petition in the St. Louis County Circuit Court alleging that Petrolite breached its obligations under the Integrity policy when it refused to reimburse MIGA the $10,000 for the retained limit after MIGA had settled the EEOC claim in the Zachary case. On September 12, 1994, MIGA filed a motion for summary judgment. After Petrolite filed a responsive pleading, the court granted MIGA's motion on November 24, 1994, and entered judgment against Petrolite in the amount of $10,000. Petrolite did not appeal.

Prior to the granting of MIGA's summary judgment motion on the original claim, Petrolite filed a counterclaim. Petrolite maintained in the counterclaim that MIGA had breached its obligation to defend and to indemnify Petrolite for the loss it incurred in the age discrimination action brought by Godar. MIGA's answer claimed that it was under no duty to indemnify Petrolite, as it was obligated only for claims which would have been covered under the original Integrity policy. MIGA claimed that the case went to the jury on a disparate treatment theory of age discrimination, an intentional act, which the Integrity policy did not cover.

Both parties filed motions for summary judgment on Petrolite's counterclaim. The court denied MIGA's summary judgment motion and granted Petrolite's motion, finding that there were no genuine issues as to any material facts and that Petrolite was entitled to judgment as a matter of law. The court entered judgment against MIGA in the amounts of $193,000, representing the actual damages awarded in the Godar action; $28,-

851.50, representing the attorney's fees awarded to Godar; and $143,704.59, representing the attorney's fees which Petrolite incurred after MIGA withdrew, for a total judgment of $365,555.59. The court then offset that amount by the $10,000 it had previously entered in favor of MIGA on its claim, and entered a net judgment against MIGA in the amount of $355,555.59. MIGA now appeals.

 Initially, it should be noted that all three of MIGA's points on appeal allege that the trial court erred in denying MIGA's motion for summary judgment and in finding that MIGA had a duty to indemnify Petrolite. Ordinarily the denial of summary judgment is not a final judgment and therefore is not an issue for appeal. *Gilmore v. Erb*, 900 S.W.2d 669, 671 (Mo.App.1995). This is true even if summary judgment is granted in favor of the other party at the same time. *Clooney v. Pre–Paid Legal Services, Inc.*, 830 S.W.2d 566, 568 (Mo.App.1992). In this case, however, MIGA's points may be construed as a challenge to the trial court's granting of Petrolite's motion for summary judgment. *First National Bank of Annapolis, N.A. v. Jefferson Ins. Co. of New York*, 891 S.W.2d 140, 141 (Mo.App.1995). We will review this case on that basis.

The standard of review for the granting of summary judgment is essentially *de novo*. *ITT Commercial Finance v. Mid–America Marine Supply*, 854 S.W.2d 371, 376 (Mo. banc 1993). When considering appeals from summary judgments, this court reviews the record in the light most favorable to the party against whom judgment was entered. *Id.* The non-movant is accorded the benefit of all reasonable inferences. *Martin v. City of Washington*, 848 S.W.2d 487, 489 (Mo.banc 1993). The propriety of summary judgment is purely an issue of law. *ITT*, 854 S.W.2d at 376.

 In its first point on appeal MIGA argues that the underlying Integrity policy would not have covered the insured for acts of intentional discrimination and therefore MIGA has no duty to indemnify Petrolite for

---

**2.** The 8th Circuit corrected the judgment for minor mathematical errors and awarded Godar

$51,056.54 in front pay and $28,581.50 in attorney's fees.

any loss resulting from Godar's suit. Section 375.785.4(1) RSMo 1986 provides that MIGA shall:

(b) Be deemed the insurer to the extent of its obligations on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent.

Under the terms of the policy, Integrity agreed to:

pay on behalf of the insured all sums, as more fully defined by the term ultimate net loss, for which the insured shall become obligated to pay by reason of liability

(a) imposed upon the Insured by law or

(b) assumed under contract or agreement by the Insured arising out of **personal injury,** property damage or advertising liability caused by an **occurrence.**

Therefore, in the present case the insured must establish both that there was an "occurrence" and that it resulted in a "personal injury." MIGA argues that neither element was met.

An "occurrence" is defined under the Integrity policy as:

an accident, including continuous or repeated exposure to conditions, which results in personal injury, property damage or advertising liability neither expected nor intended from the standpoint of the Insured.

MIGA argues that there can be no liability under the Integrity policy because the jury in the Godar case found that Petrolite had intentionally discriminated against Godar. Since the result of the act of intentional discrimination is both expected and intended, MIGA contends that no "accident"[3] took place, and therefore there was no "occurrence" within the meaning of the policy.

MIGA's position that the term "occurrence" covers only unintentional acts is not justified by the policy read as a whole as the policy's definition of "personal injury" includes a number of intentional torts. The torts specifically listed in the policy's definition of "personal injury" include false arrest, false imprisonment, wrongful eviction, wrongful entry, wrongful detention, malicious prosecution, libel, slander, defamation of character, and racial, religious, sex and age discrimination, all of which, by definition, are intentional. MIGA's interpretation of the policy is contradictory.[4]

In this case, the Integrity policy offers coverage for age discrimination and other intentional torts through the definition of "personal injury" but denies any coverage for those claims in its definition of "occurrence" by requiring that the act be unexpected and unintentional. When a contract promises something in one place and takes it away at another place an ambiguity exists. *Behr v. Blue Cross Hosp. Serv., Inc.,* 715 S.W.2d 251, 256 (Mo.banc 1986). The meaning of an ambiguous phrase is not considered in isolation but by reading the policy as a whole. *Chase Resorts, Inc. v. Safety Mut. Cas. Corp.,* 869 S.W.2d 145, 150 (Mo.App. 1993). If an insurance policy is open to different constructions the one most favorable to the insured must be adopted. *Id.* Given the conflicting language of the Integrity policy we find that an ambiguity exists and interpret the policy in favor of the insured by finding coverage for Petrolite.

MIGA further contends that even if this court finds that there was an "occurrence", the policy does not extend coverage because the conduct involved failed to meet the definition of a "personal injury."

The policy defines "personal injury", in relevant part, as:

(4) racial, religious, sex or age discrimination (unless insurance thereof is prohibited by law) **not committed by or in the direction of the insured** but only with respect to the liability other than fines and penalties imposed by the law.

MIGA suggests that after correcting a typographical error, the highlighted portion of the policy should be read as "not committed by or at the direction of the insured." MIGA contends that in this case the discrimination

---

**3.** The term accident is not defined by the policy.

**4.** MIGA attempts to differentiate acts of age discrimination as being either disparate impact claims which fall within the definition of "occurrence" and are covered or disparate treatment claims which do not fit within the definition and are not covered. Discussion of that distinction is not relevant for the disposition of this case and we will not address that argument herein.

was committed at the direction of the insured, Petrolite, and therefore no coverage exists. We find this argument inconsistent. The "occurrence" definition of the policy limits coverage to "accidents" which the insured does not intend or expect. The "personal injury" definition, however, extends coverage to racial, religious, sex and age discrimination, but only for the acts not committed by or at the direction of the insured. Reading the "personal injury" definition and the "occurrence" definition together, the policy apparently provides coverage for "unintentional intentional torts" not committed by or at the direction of the insured. As noted by Judge Smith in his dissent in *Missouri Intergovernmental Risk Management Association v. Gallagher Bassett Serv. Inc.*, 854 S.W.2d 565, 570 (Mo.App.1993)[5] the result of such language is "complete nonsense." In that case, as in this one, the policy definition of "personal injury" included a number of intentional torts, including discrimination, while the definition of "occurrence" limited coverage to unintentional acts.

At least one other jurisdiction has extended coverage when faced with similar oxymoronic language. *Lincoln Nat'l Health and Casualty Ins. Co. v. Brown*, 782 F.Supp. 110, 113 (M.D.Ga.1992). It is implausible that any business would pay for such illusory coverage. The granting of Petrolite's summary judgment motion was proper because of these ambiguities.

In the final subpoint of MIGA's first point, it argues that the trial court erred in indemnifying Petrolite for the amount of attorney's fees awarded to Godar. This argument is largely based on MIGA's mistaken position that Godar's claim was not a covered claim within the Integrity policy. Since we have found that the claim was covered, there is no need to address this argument further. Point denied.

In the second point on appeal, MIGA argues that the trial court erred in holding that Petrolite was entitled to indemnification for the costs of appealing the case to the 8th Circuit. Under the "Defense Provisions" of the policy, Integrity contracted to pay defense costs: 1) where the insurer voluntarily undertook the defense, and 2) when the un-

derlying policies provided no coverage, but the Integrity policy covered the claim. In the present case, as addressed above, the Integrity policy did cover the claim and there was no other underlying coverage. Therefore, MIGA was obligated to provide a defense. Point denied.

 In the final point on appeal, MIGA contends that even if it is found that MIGA is obligated to indemnify Petrolite, MIGA's total liability cannot exceed $299,800 because Section 375.785.4(1)(a) RSMo 1986 limits MIGA's obligation to the amount of each covered claim which is in excess of $200 and is less than $300,000. Accordingly, MIGA argues that the trial court erred when it entered a judgment in the amount of $365,555.59. Of that amount, $143,709.59 represented the legal fees Petrolite incurred after MIGA withdrew its representation. The remaining $221,851 represented the amount of actual damages and the amount of Godar's legal fees. MIGA argues that the "claim" included Petrolite's legal fees, and therefore exceeded the limit under § 375.785.4(1)(a). We find this argument unpersuasive. MIGA, like Integrity, had dual obligations under the policy. First, MIGA was required to indemnify the insured for any losses resulting from covered claims up to the policy limit, or $299,800, whichever is less. Second, MIGA is required to provide a defense to the insured. There is no language in the statute that the costs to defend the insured is included in the total amount that MIGA is obligated to pay the insured under § 375.785.4(1)(a). Furthermore, as a practical matter, MIGA's interpretation would lend itself to abuses clearly not intended by the legislature. Under MIGA's interpretation, it could provide a defense in a complicated case and exhaust the $299,800 statutory limit, leaving the insured with no indemnification for the actual claim. Point denied.

Judgment is affirmed.

SMITH, P.J., and GARY M. GAERTNER, J., concur.

---

**5.** The majority opinion resolved the case without reaching this issue.